Ambassador, Inc. (Formerly 14th Street Development Company) v. Commissioner.
Ambassador, Inc. v. Commissioner
Docket No. 29629.
United States Tax Court
1952 Tax Ct. Memo LEXIS 75; 11 T.C.M. (CCH) 974; T.C.M. (RIA) 52289; September 30, 1952
*75 Held, on the facts, petitioner's predecessor Development Company, was engaged during 1938 in a business of buying and selling real estate, and that a particular property sold in 1938, which had been acquired in 1935 at a foreclosure sale, was held by Development primarily for sale to customers in the ordinary course of its trade or business within Section 117, Internal Revenue Code. Harry J. Rudick, Esq., 25 Broadway, New York, N. Y., and Joyce Stanley, Esq., for the petitioner. Paul E. Waring, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined deficiencies in excess profits taxes for the years 1944 and 1945 in the respective amounts of $118,556.51 *76 and $253,102.18. The Commissioner has determined that for the purpose of computing the excess profits credit of the petitioner allowable for the years 1942 to 1945, inclusive, the gain realized on the sale of Corcoran Courts Apartments in 1938 represented capital gain under the provisions of section 711 (b) and 117 (j) of the Internal Revenue Code, and, therefore, he excluded such gain from normal tax net income for 1938 in determining average base period net income. The petitioner's predecessor corporation was 14th Street Development Company into which the petitioner was merged in March, 1944. In 1938, 14th Street Development Company sold an apartment house property in Washington, D.C., Corcoran Courts Apartments, and realized a gain of $252,273.38. The only question to be decided is whether the gain was ordinary income, as the petitioner contends, or capital gain as the respondent has determined. Findings of Fact The facts which have been stipulated are found as facts, and the stipulation is incorporated herein by reference. The petitioner filed its returns for the years involved with the collector at Baltimore, Maryland. The petitioner was incorporated *77 in 1926 under the laws of the State of Delaware, under the name of 14th Street Development Company. Another corporation, Ambassador, Inc., was incorporated in July, 1928, under the laws of the State of Delaware (hereinafter called "old Ambassador"). In March, 1944, old Ambassador was merged into 14th Street Development Company, and under the merger agreement, in March, 1944, the name of 14th Street Development Company was changed to Ambassador, Inc., and the original Certificate of Incorporation of 14th Street Development Company was amended accordingly. 14th Street Development Company (hereinafter sometimes referred to as the Development Company) was organized for the purpose of engaging in the business of purchasing, selling, holding and renting real estate, and building and selling houses and other buildings. Under the agreement between and among the organizers of the company, the corporation was to construct upon certain land apartments, stores, or dwelling houses, the Cafritz Construction Company was to perform the construction work, and the Cafritz Company was to advertise the buildings for sale when and as completed and was to receive the customary brokerage fees for selling *78 the same. During the period shortly after the incorporation of the Development Company in 1926 until November 1, 1943, Morris Cafritz owned 90 shares out of 96 shares of the total outstanding common stock of the company; and 1,000 shares out of 1,550 shares of the total preferred stock outstanding; and during the same period, Carrie Carroll owned the remainder of the outstanding stock of the Company, namely, 6 shares of common and 550 shares of preferred. On November 1, 1943, the 6 shares of common and 550 shares of preferred stock held by Carrie Carroll were redeemed by the Development Company and from that date until the merger of old Ambassador into 14th Street Development Company on March 31, 1944, Cafritz owned all of the outstanding common and preferred stock of Development Company. From the date of its incorporation in July, 1928, until its merger into 14th Street Development Company on March 31, 1944, Cafritz was the president and controlling stockholder of old Ambassador. The Cafritz Company was incorporated on June 23, 1925, and Cafritz was the controlling stockholder. Cafritz Company was the company that managed and sold most of the properties owned by the several *79 Cafritz corporations, and all of the sales transactions of the Cafritz corporations were handled by that company. Cafritz Company also sold properties for outside interests. Cafritz Construction Company was incorporated on May 22, 1922, and Cafritz was the controlling stockholder. Cafritz Construction Company was primarily a building company and it also bought and sold properties. Cafritz was the president and sole stockholder of the present petitioner, Ambassador, Inc., except for single shares issued to two other persons to qualify them as directors. The first transactions of 14th Street Development Company were the building and sale of a group of single-family houses on Parkwood Place, N.W., in Washington, D.C. On April 14, 1926, Cafritz, the president and controlling stockholder of the company, sold to the company for $159,221.41 a portion of a tract of land known as the Lenman Tract, facing on 14th Street, N.W., Washington, D.C. During the period 1926 to 1928, the Development Company built thirty-eight single-family houses on a part of that tract, facing on Parkwood Place. Thirty-six of these houses were sold by the company between August 25, 1926 and August 24, 1928. The *80 larger houses on the south side of the street were sold at prices ranging from $15,950 to $13,950, and the somewhat smaller houses on the north side of the street were sold for $10,950. The company was unable to sell two of the houses and they were held until May, 1943, at which time they were sold. Between August 19, 1929 and December 31, 1938, the company reacquired upon mortgage foreclosure proceedings fifteen out of the thirty-six houses which it had sold in the Parkwood Place Development. After the company reacquired these houses on mortgage foreclosure proceedings it renovated the properties and immediately attempted to sell them again. The company had signs up on the houses showing that they were for sale, it advertised them, it had one house kept open as a sample house. Of the fifteen reacquired houses, two were resold in 1929, one was resold in 1935, seven were resold in 1942, and five were resold in 1943. During the period that the company held these reacquired properties and held the two houses that it was unable to sell until May, 1943, it rented the houses when it was possible to do so and reported the rental income in its income tax returns and deducted depreciation *81 on the houses. In June, 1931, the Development Company sold to the Standard Oil Company for $93,625 a portion of the tract acquired in 1926, the section sold being known as Lot 804 in Square 2688. In April, 1937, the Development Company sold another portion of the tract acquired in 1926, known as Lot 54 in Square 2688, to the Central Realty Company for $30,000. After the houses in the Parkwood Place Development had been built and after the above two tracts of land had been sold to the Standard Oil Company and to the Central Realty Company, the only unimproved land remaining in the Development Company out of the portion of the tract acquired in 1926 were two large parcels, one at the corner of Ogden and Otis Streets and the other in the rear of that parcel facing on Otis Street, together with a small piece of land adjacent to the parcel sold to the Standard Oil Company. The company had originally intended to build houses on this land, but, due to the fact that it had had difficulty in selling the houses in the Parkwood Place Development and due to the depression in the real estate during that period, it decided not to build any more houses. The company tried to sell the remaining *82 land on many occasions but could not get a buyer for it. The two large parcels and the one small parcel of land remaining out of the tract acquired by the company in 1926 were therefore held by the company as unimproved property until 1937 and 1938. In 1937 and 1938 the Development Company built two apartment buildings on the two large parcels (referred to below). A store was built on the small parcel which was sold in 1949. The second group of transactions carried on by 14th Street Development Company was in connection with the Lingerwile Tract in Washington, D.C. This was a 50-acre tract of land which had originally been owned by Cafritz individually. He had sold it to Bauman Brothers in Washington, D.C., who were builders. When Bauman Brothers defaulted on the payments the property was foreclosed in 1931 and was purchased by the Development Company at the foreclosure sale for $75,000. At the time the Lingerwile Tract was acquired by the Development Company it was subdivided into 142, 40-foot lots. When the Development Company acquired the tract it intended to develop it and build houses on it but, because of the depression in the real estate market, the company decided not to *83 build any more houses. The lots were advertised for sale and during the period from December 1931 to March 1938, the Development Company sold sixty-six lots to six different construction companies. At the end of 1938 the company still had remaining seventy-six lots in the Lingerwile Tract. These lots were held by the company until November 1, 1943, when they were transferred to Mrs. Carrie Carroll as part consideration for the purchase by the company of her stockholdings in the company consisting of 6 shares of common stock and 550 shares of preferred stock. The third group of transactions carried on by 14th Street Development Company was in connection with certain improved properties. On November 10, 1933, the company acquired seven improved properties, located in Washington, D.C., from the Estate of Harry Carroll, a brother-in-law of Cafritz. At the time the properties were acquired they were in bad condition and the company planned to renovate them and sell them at a profit as soon as possible. Some of the properties were single-family houses and one was a store and a small apartment at the corner of 12th and U Streets, N.W., Washington, D.C. In attempting to sell these properties *84 the company had signs on some of the houses showing that they were for sale, they advertised the properties and they let it be known among the real estate brokers that the properties were for sale. These properties, and the dates they were sold by the company are set forth below; the properties at 4th Street, N.W. and at Ford Court, N.W., Washington, D.C., are still held by the petitioner. 2317
First Street, N.W., Washington, D.C.;
sold by 14th Street Development Com-
pany in 1936.
1201
U Street, N.W., Washington, D.C.; sold
by 14th Street Development Company
in December, 1940.
916
Fifth Street, S.E., Washington, D.C.;
sold by 14th Street Development Com-
pany in 1943.
1140
Sixth Street, N.W., Washington, D.C.;
sold by 14th Street Development Com-
pany in 1943.
302
S Street, N.E., Washington, D.C.; sold
by the petitioner, Ambassador, Inc., in
August, 1944.
709-711-713-715
Fourth Street, N.W., Wash-
ington, D.C., still owned by the peti-
tioner, Ambassador, Inc.
312-314-316
Ford Court, N.W., Washington,
D.C.; still owned by the petitioner,
Ambassador, Inc. The company made a profit on the sales of these properties *85 that were disposed of. During the period that the company held these improved properties it rented them when it was possible to do so and reported the rental income in its income tax returns and deducted depreciation on the properties. The following schedule summarizes the number of sales made by Development Company during the period 1926 through 1938: Parkwood
Other Land
Other
Place
from Lenman
Lingerwile
Improved
Year
Houses
Tract
Lots
Properties
1926
10
1927
22
1928
4
1929
2
1930
1931
Land sold to
7
Standard Oil
1932
1933
1934
1935
1
15
1936
8
1
1937
Land sold
22
to Central
Realty Co.
1938
14
Corcoran
Courts
Apartments
In 1937, 14th Street Development Company commenced the construction of two apartment buildings, Otis Gardens at 1445 Otis Place, N.W., Washington, D.C., at a cost of $329,480, and Ogden Gardens at 1445 Ogden Place, N.W., Washington, D.C., at a cost of $339,170.37. Construction was completed in the early part of 1938. Each of these buildings contained about 100 apartment units. In 1938, Development commenced the construction of a third apartment building, *86 Park Crescent Apartments, at 2901 18th Street, N.W., Washington, D.C., at a cost of $277,359.81. This building contained about 60 apartment units. Construction was completed in the latter part of 1938. These three apartment buildings are still owned by the company. The three apartment buildings, Otis Gardens, Ogden Gardens and Park Crescent Apartments, were built by the company with the intention of holding them as rental properties. The rental income therefrom was reported on the company's income tax returns and depreciation on the buildings was claimed and allowed. The first two buildings were built on a part of the tract acquired by the company in 1926 which land the company had been unable to sell. All three apartment buildings were in a good location where the rentals that could be charged were higher than the rentals that could be charged in the area where Corcoran Courts Apartments was located. On July 10, 1935, 14th Street Development Company bought at a foreclosure sale for $410,000 an apartment building known as Corcoran Courts Apartments, located at 23rd and D Streets, N.W., Washington, D.C. The foreclosure sale was on a foreclosure of the first deed of trust on the *87 property. Corcoran Courts Apartments was originally built in 1925 and 1926, the construction being completed and the building first occupied in the early part of 1926. The building contained 166 apartment units, was 8 stories high, and covered about 20,000 square feet. Cafritz individually contracted to construct the building for Corcoran Courts Corporation. Cafritz, the president and controlling stockholder of the petitioner was the president and sole stockholder of Corcoran Courts Corporation at the time the apartment building was constructed. The construction of Corcoran Courts Apartments was financed by 7 percent first mortgage bonds of Corcoran Courts Corporation in the amount of $800,000, under a deed of trust dated July 1, 1925, between said corporation and Samuel J. Henry, as trustee. The trustee was the president and a large stockholder of the F. H. Smith Investment Company of Washington, D.C., which marketed the bonds. Under the deed of trust Cafritz personally guaranteed the payment of both the principal and interest of the first mortgage bonds. Immediately after the construction of Corcoran Courts Apartments was completed in 1926, Corcoran Courts Corporation tried *88 to sell the property. Morris Cafritz, the president of the corporation, talked with several brokers about selling the building. The property was sold on May 14, 1926, to John S. Egan, a straw for Harry Wardman, a large real estate operator in Washington, D.C. The property was sold subject to the first deed of trust of $800,000 which the grantee assumed and agreed to pay. The consideration for the sale, in addition to the assumption of the first mortgage, was $50,000 in cash and the conveyance by John S. Egan to Morris Cafritz of five lots in Square 378, Washington, D.C. The total consideration received on the sale of Corcoran Courts Apartments was approximately $1,500,000. After the sale of Corcoran Courts Apartments by Corcoran Courts Corporation on May 14, 1926, the property was never owned by Cafritz or any organization or corporation in which he was interested until it was purchased by 14th Street Development Company on July 10, 1935. After the sale of Corcoran Courts Apartments to John S. Egan on May 14, 1926, the property was subject to several transfers. The property was transferred on May 14, 1926, by John S. Egan to other straws for Wardman, namely, Edward J. Kyle and *89 James F. Salkeld for the purpose of having Kyle and Salkeld place a second trust on the property which they did on May 15, 1926, in the amount of $300,000. On June 15, 1926, Kyle and Salkeld deeded the property to Robb F. Allensworth, also a straw for Harry Wardman. On the same day, Allensworth placed a third trust on the property in the amount of $200,000. On July 7, 1926, Allensworth deeded the property to Corcoran Courts Hotel Corporation, a corporation owned and controlled by Maud Ford and Richard Merrick. On October 14, 1926, Corcoran Courts Hotel Corporation deeded the property to Hugh Woods who was another straw for Harry Wardman. The third deed of trust in the amount of $200,000 was released on November 8, 1926. On December 14, 1926, Hugh Woods placed a second trust of $300,000 on the property; this trust was a substitute for the earlier second trust in the amount of $300,000 placed on the property on May 15, 1926. On November 10, 1928, the property was foreclosed under the above second deed of trust dated December 14, 1926, and was purchased by Henry J. Robb and Robert N. Taylor, both being straws for Harry Wardman. On June 1, 1929, Robb and Taylor placed a second deed of *90 trust on the property in the amount of $300,000, the trustee being the National Bank of Washington, Washington, D.C. This second trust was extinguished upon the foreclosure of the first trust on July 10, 1935. The bonds in the amount of $800,000 issued under the first deed of trust placed on the property on July 1, 1925, were serial bonds. Certain of the bonds matured on July 1 of each year, beginning with $20,000 on July 1, 1927 and increasing to $40,000 on July 1, 1934. The balance of $563,000 matured on July 1, 1935. During the period between the sale of Corcoran Courts Apartments by Corcoran Courts Corporation on May 14, 1926, to the Wardman interests and the time of the foreclosure of the first trust on the property on July 10, 1935, the building did not earn enough to pay the interest and maturing principal on the bonds, and Cafritz, because of his personal guarantee of the interest and principal payments on the bonds, had to use his personal funds to make good the deficiencies. During the first two years after the sale of the building on May 14, 1926, the property was being inefficiently operated and Cafritz believed that if he could operate the building he could produce *91 larger earnings and would therefore be able to reduce the payments he had to make from his individual funds in order to meet his guarantee of the principal and interest on the first mortgage bonds. On November 1, 1928, an agreement was entered into by Harry Wardman (who presumably still had an interest in the property), Thomas P. Bones and James D. Hobbs (the parties then secured by the second deed of trust on the property), Morris Cafritz (as guarantor of the first mortgage bonds), and Samuel J. Henry, the trustee under the first deed of trust, under which agreement Cafritz was given the right to manage and operate the building. Cafritz continued to manage and operate the building under that agreement until January 28, 1930. Beginning in 1930 two separate court actions were commenced in the District Court of the District of Columbia by certain holders of first mortgage bonds of Corcoran Courts Corporation, requesting, among other things, the removal of the trustee under the first deed of trust and the appointment of a substitute trustee. As a result of these court actions, the Court, on January 28, 1930, appointed Cafritz receiver to manage the property and to collect the income *92 therefrom. Cafritz acted as such receiver until the foreclosure sale of the property on July 10, 1935. During the period October 1, 1926 to January 24, 1930, Cafritz paid as guarantor of the first mortgage bonds $58,754.54 in interest payments and $73,333.32 as payments on the principal of the maturing first mortgage bonds on the property, a total of $132,087.86. During the period from October 1, 1926 to June 30, 1931, Cafritz paid out of his personal funds the amount of $171,433.14 as interest and principal payments on the bonds. On July 1, 1935, when first mortgage bonds of Corcoran Courts Corporation in the amount of $563,000 became due, Corcoran Courts Corporation was unable to pay the principal and interest due on the bonds and, as a result thereof, foreclosure proceedings were begun. On July 10, 1935, the property was sold at public auction and was purchased by 14th Street Development Company for $410,000. After the foreclosure sale of the property the accounts of the American Security and Trust Company, the substituted trustee under the first deed of trust, showed a balance of principal and income in the amount of $404,256.61 available for distribution on bonds then due *93 in the face amount of $564,500, or an amount of $71.61 per $100 bond. On July 10, 1935, when the property was purchased by 14th Street Development Company, Cafritz personally owned first mortgage bonds of Corcoran Courts Corporation due on July 1, 1935, in the face amount of $521,400. Cafritz' only purposes in having one of his corporations, 14th Street Development Company, bid in the property at the foreclosure sale on July 10, 1935, was to protect himself as far as possible on his personal guarantee on the $563,000 worth of first mortgage bonds due on July 1, 1935, and to attempt to recoup some of his earlier losses on the property by having the Development Company resell the building at a profit. He believed that the purchase price was sufficiently low so that he, acting through his corporation, would be able to sell the building at a sufficient profit to recoup at least part of his previous losses. Cafritz never intended or desired to have 14th Street Development Company or any of his corporations own Corcoran Courts Apartments as a permanent investment or as a rental property. Prior to the foreclosure sale Cafritz talked with several real estate brokers in Washington about *94 the property and told them that he intended to bid in the property for one of his corporations and that if he did purchase the property he wanted to sell it. Prior to the foreclosure sale he told a real estate broker James Salkeld of Washington, D.C., that it he, Cafritz, bid in the property for any of his corporations he would give Salkeld a 30-day exclusive agency to sell the property. Immediately after Corcoran Courts Apartments was purchased by 14th Street Development Company, Cafritz, as president of the company, gave James Salkeld a 30-day exclusive right to sell the property at a price of $700,000. Salkeld did not receive any cash offers or other acceptable offers for the property. After the expiration of the 30-day period Cafritz talked with several other real estate brokers in Washington, D.C., and told them that the property was for sale. Among other brokers were Edward L. Strochecker and Samuel S. Spruce. Salkeld, Strochecker, and Spruce tried diligently to sell the property during the entire time the Development Company owned it, but all were unsuccessful in obtaining cash or other acceptable offers. All three of the foregoing brokers, as well as Cafritz, believed that *95 the property was salable at a price that would be acceptable to Cafritz. The brokers understood that Cafritz would probably be willing to accept a trade for the building or, if the sale was for cash, that he would be willing to accept a somewhat lower price than $700,000. At least one of the brokers, Salkeld, received offers of trades of other properties for the building, but none of these offers was acceptable to Development Company. One of the objections of those to whom the brokers showed the property was its location which then was inaccessible to transportation and shopping facilities. Prior to October 1, 1936, there had been negotiations between the Cafritz Company, which was the management and sales company for the several Cafritz corporations, and the Department of Interior of the United States Government with respect to the sale of the Corcoran Courts property. On October 1, 1936, Cafritz Company on behalf of Development Company made a written offer to the Department of the Interior of the United States Government to sell the building for $700,000. After lengthy negotiations Development Company, on July 14, 1938, submitted a formal proposal to the Director of Procurement, *96 Treasury Department, pursuant to which it offered to sell Corcoran Courts Apartments to the United States Government for the sum of $651,000. On July 22, 1938, the Director of Procurement accepted the offer of Development Company to sell Corcoran Courts Apartments to the United States for $651,000. The sale was closed. Development realized gain on the sale in the amount of $252,273.38. After 14th Street Development Company purchased Corcoran Courts at foreclosure on July 10, 1935, it renovated the building, painted the apartments, did considerable plastering work, and improved the exterior of the building in order to make the building more desirable to purchasers. Development Company had no intention of doing anything but sell the property, and it tried to sell the property continuously. During the period from the acquisition of the property by the Development Company on July 10, 1935, to its sale on July 22, 1938, the Development Company operated Corcoran Courts Apartments as a family apartment house and leased the various units therein to tenants. In 1938 the building was approximately 95 percent occupied. During the entire period of its existence, up until 1937, the sole business *97 of Development Company was that of buying and selling improved and unimproved real estate, the building of houses and the sale thereof. During this entire period all of the properties held by Development Company, including Corcoran Courts Apartments, were held primarily for sale to customers in the ordinary course of Development's business. The three apartment houses, Otis, Ogden and Park Crescent Apartments, built by Development in 1937 and 1938, were the first properties purchased or constructed by Development with the intention of holding them as rental properties. During 1937 and 1938, and thereafter, Development was engaged in two businesses, that of holding its other property primarily for sale to customers in the ordinary course of its business of buying and selling real estate, and that of holding and operating the above named, three apartment buildings in a business of renting properties. Development purchased Corcoran Courts Apartments in 1935 with the intention of selling the property as soon as possible at a profit, and never had any intention of holding the building as rental property or for investment. During the entire period Development held Corcoran Courts, from *98 July 10, 1935 to July 22, 1938, Development was active in its efforts to sell the property. Corcoran Courts Apartments was held by Development Company primarily for sale to customers in the ordinary course of its business during the entire period from July 10, 1935 until July 22, 1938. The gain realized upon the sale in 1938 of Corcoran Courts was not a gain from the sale of a capital asset held for more than six months. Opinion The petitioner claims that it has excess profits credits for the taxable years 1944 and 1945, together with unused excess profits credits for 1942 and 1943, carried over to 1944 and 1945, which is sufficiently large to wipe out excess profits tax liability for 1944 and 1945. The petitioner computes its excess profits credit on the basis of income. The issue presented relates to determination of petitioner's base period income for 1938, the year in which Corcoran Courts Apartments was sold. If the Corcoran Courts Apartments property was a capital asset held for more than six months, under the provisions of sections 117 (a) and (j) of the Code, then the capital gain which was realized by petitioner's predecessor, Development Company, in 1938 must be excluded *99 from normal-tax net income and special-class net income under the provisions of section 711 (b) (1) (B). In determining in this proceeding whether the gain in question was gain from the sale of a capital asset held for more than six months, the provisions of section 117 are applicable as though section 117 were part of the revenue law applicable to 1938, one of the base period years, by virtue of section 711 (b) (2) of the Code. Accordingly, the issue presented is whether the Corcoran Courts Apartments property was a capital asset held for more than six months, as the respondent has determined. The respondent has excluded the gain in question from normal-tax net income for 1938, thereby reducing the amount of petitioner's excess profits credits. The petitioner contends that the evidence establishes basic and ultimate facts, as follows: (1) That after the sale of Corcoran Courts Apartments by Corcoran Courts Corporation on May 14, 1926, the property was never owned by Morris Cafritz, or any organization or corporation in which he was interested until it was purchased at foreclosure by Development Company on July 10, 1935. (2) That during the entire period of its existence, up until *100 1937, the sole business of Development Company was that of buying and selling improved and unimproved real estate, and the building of houses on unimproved realty, and the sale thereof. (3) That during this entire period, all of the properties held by Development Company, including Corcoran Courts Apartments, were held primarily for sale to customers in the ordinary course of Development Company's business. (4) That although Development Company in 1938 completed three apartment house properties, Otis Gardens, Ogden Gardens and Park Crescent Apartments, which it built with the intention of holding them as rental properties, and which petitioner continued to hold and still owns, the Corcoran Courts Apartments property was never held by Development Company as rental property and is not to be put in the same class with the aforesaid three apartment house properties which were completed in 1938. (5) That during and subsequent to 1937 and 1938, Development Company was engaged in two businesses, that of holding its other property primarily for sale to customers in the ordinary course of its business of buying and selling real estate; and that of holding and operating the three apartment buildings, *101 Otis, Ogden, and Park Crescent, in a business of renting properties. (6) That Development Company purchased Corcoran Courts Apartments at the foreclosure sale on July 10, 1935, with the intention of selling the property as soon as possible at a profit; that it held the property primarily for sale; and that it never had any intention of holding the property for use in a business of renting properties or as an investment of rental property. If the evidence establishes the foregoing ultimate facts, it follows that Corcoran Courts Apartments was not a capital asset of Development Company under the provisions of section 117 of the Code. There are two questions to be decided under the issue presented; first, whether Development Company was engaged in 1938 in a business of buying and selling properties; and second, whether, if it was engaged in such business, the Corcoran Courts property was property held primarily for sale to customers in the ordinary course of that business. Both of these questions are essentially questions of fact and each case must turn upon its own facts and circumstances. Rubino v. Commissioner, 186 Fed. (2d) 304, certiorari denied, 342 U.S. 814; *102 Mauldin v. Commissioner, 195 Fed. (2d) 714; Friend v. Commissioner, 198 Fed. (2d) 285 (C.A. 10, decided August 14, 1952). No single test is determinative of these questions, but certain factors have been laid down by the courts as helpful and appropriate for consideration of the facts and in reaching solutions of these questions. See Boomhower v. United States, 74 Fed. Supp. 997; Mauldin v. Commissioner, supra; Rollingwood Corporation v. Commissioner, 190 Fed. (2d) 263; Dunlap v. Oldham Lumber Co., 178 Fed. (2d) 781; Albert Winnick, 17 T.C. 538, 541, 542. It is not necessary to restate these now well known factors. In considering the evidence in this proceeding, consideration has been given to them. Upon consideration of all of the evidence, and of the judicially approved guides to be taken into account, it is held and has been found, that Development Company in 1938 was engaged in a business of buying and selling both improved and unimproved property, and that Corcoran Courts Apartments was held at all times primarily for sale to customers in the ordinary course of Development Company's business *103 of buying and selling property. Consideration has been given to respondent's views about the evidence and to the authorities he has cited. With respect to the evidence, it supports the facts for which petitioner has made contention rather than the facts which the respondent has urged should be found. With respect to the authorities upon which respondent relies, this proceeding must be and is distinguished from them upon the facts found here. (1) Development Company was engaged in a business of selling property. The evidence shows that from 1926 through 1938, Development sold either improved property or unimproved land and lots. Sales were frequent and were not merely isolated transactions. During this period there were times when the real estate market was depressed and was affected adversely by economic conditions and sales fell off. But depressed market conditions are one factor to be given consideration, and whether or not Development was engaged in a business of buying and selling real estate is a fact to be found from consideration of all pertinent factors. The record in this proceeding shows that Development's business of selling property during this period consisted of activities *104 in the building of houses on subdivided land it owned, and selling them; reselling houses reacquired upon defaults; and subdividing raw land and selling unimproved lots; but the variety in the types of property Development dealt in does not militate against its claim that it was engaged in a business of buying and selling property during the period 1926 through 1938. See Julius Goodman, 40 B.T.A. 22; Charles H. Black, 45 B.T.A. 204; Walter G. Morley, 8 T.C. 904. Some properties were rented until they were sold, but they were properties which were held primarily for sale, and delays in finding buyers, particularly when due to a depressed real estate market, as here, do not convert the holding of the properties from holding for sale to holding for investment. Neils Schultz, 44 B.T.A. 146, Charles H. Black, supra.Upon all of the evidence we are satisfied that there were the continuity and frequency of sales which are required in order for the business of Development during 1938 and before, to be classified as one of holding property primarily for sale to customers in the ordinary course of business. It is so held. Development *105 Company's sole business activity from its organization in 1926 had been buying and selling property and the properties it held were held primarily for sale to customers, until it built upon some of its properties in 1937, and completed in 1938, three apartment buildings with the purpose of holding them as rental properties. Therefore, in 1937 and 1938, Development went into different business activities, and had two types of business. It continued each type of business after 1938. Although the respondent argues that in 1938, Development's only business was holding properties for rental, and, therefore, investment, the evidence is to the contrary and we cannot approve respondent's contention. Development continued in 1938 to be engaged in a business of selling real estate. A taxpayer can be engaged in more than one type of business, as has been held in many cases by this and other courts, and one of them can be buying and selling real estate. See Greene v. Commissioner, 141 Fed. (2d) 645; Nelson A. Farry, 13 T.C. 8. (2) Corcoran Courts was held primarily for sale to customers. The issue relates chiefly to one, particular piece of property held by Development, *106 Corcoran Courts, and the dispute between the parties is whether that property was held for rental or for sale, i.e., under our conclusion that Development was engaged in two, distinct business activities, the question is whether Corcoran Courts was a property held in one or the other of the two businesses of Development in 1938, and before. The evidence establishes clearly that Corcoran Courts was a property held primarily for sale in Development's business of selling real estate. The facts relating to the acquisition by Development of Corcoran Courts in July, 1935; the intention of Development at the time of acquisition; and Development's continuous efforts to sell the property are set forth fully in the findings of facts and it is unnecessary to restate them. The property was sold three years after acquisition. We are satisfied from all of the evidence that this property was held during those three years primarily for sale to customers in the ordinary course of Development's business of buying and selling property. Walter G. Morley, supra; Queensboro Corporation, 46 B.T.A. 1216, aff'd on another point, 134 Fed. (2d) 942. It is held, therefore, *107 that the gain realized upon the sale in 1938 was not gain from the sale of a capital asset held for more than 6 months. Decision will be entered for the petitioner.